May it please the Court, I will address the Fourteenth Amendment and qualified immunity issues and Ms. Larson will address the official capacity in Eighth Amendment arguments. The District Court erred in granting the defendants motion for summary judgment because there are at least four genuine issues of material fact about whether Mr. Christman gave informed consent to anti-androgen treatment with Lupron. First, prior to the initiation of Lupron therapy, defendants did not inform Mr. Christman that bone density loss was a potential side effect, much less osteoporosis. Mr. Christman claims that he that he was told that he would experience mild side effects such as hot flashes and waking but not bone density loss. He further claims that defendants failed to tell him about the dangerous side effects of the drug. Mr. Christman did not learn of the debilitating side effects until much later. Second, Mr. Christman never received the anti-androgen comparison worksheet that mentions bone density loss but rather received a different handout that made no mention of that potential side effect. Mr. Christman includes the only written document he received about the side effect in the verified complaint and it gives no information about potential bone density loss. Third, though Mr. Christman signed a it was a generic form that gave no indication that bone density loss and osteoporosis were potential side effects of the treatment. And fourth, Mr. Christman never learned of the potential side effects while attending the medication management class. Though he was informed of various side effects of medications, he was never informed that osteoporosis was a potential side effect. What do you have to establish to present a cognizable 14th Amendment claim? You have to show that there is an... we're saying that he did not receive informed consent so he needed enough information to make a rational decision. And since he wasn't told that bone density loss was a side effect he couldn't make a rational decision. Even if he was told that bone density loss was a potential side effect among others and it wasn't explained to him, it still wouldn't rise to informed consent. What's your key case on this? Benson v. Terhune is the case on informed consent. And it says that a plaintiff must be able to exercise or a person must be able to exercise rights to avoid unwanted medical treatment intelligently. And so they need all the equivalent of battery. And I'm just a regular doctor-patient context. You don't tell me what the problems are. You touch me and it's a battery because I haven't... my consent to your touching me hasn't been informed. Right, but in this case since he was civilly committed then it rises to a 14th Amendment violation. So your whole point here is just that there is a genuine tribal issue of that way. The district court improperly adopted the defendant's uncontroverted statement of genuine issues. Why was that improper? Because under Jones v. Blanus, a civilly committed patient who has verified contentions on the record, those verified contentions need to be considered by the district court. And Mr. Keisman made a number of arguments in his verified complaint. In addition, he had a factual background to his memorandum in opposition to summary judgment that included facts that the district court did not consider. Well, his memorandum wasn't verified. His memorandum wasn't verified, but it did reference the original verified complaint that has a number of claims that he wasn't informed of the treatment, I mean of the potential side effect. And even without the memorandum, the other issues that the plaintiff brings up are subject to interpretation according to the verified complaint that leaves room for genuine issues and material fact. For instance, with the medical information class, the plaintiff claimed that Mr. Keisman attended such a class and he did. And they say on specific dates he received information about Lupron side effects, which he did, but it never says that he received information about osteoporosis and bone density loss. What relief is Mr. Keisman seeking in this case now? He's seeking both prospective injunctive relief and he's seeking monetary damages. If he were to go to, if he were to prevail at trial, what form of injunctive relief would he ask the district court to impose? To not receive Lupron treatment in the future and to ensure that other patients being treated at the facility. I thought from reading the government's, the state's briefs and whatnot, that they're no longer... It's actually contradictory in their statement of uncontroverted facts. There's one place in there where they say that nobody is on Lupron anymore and another place they admit that ten patients are still on Lupron. And it's this long-term Lupron treatment where a number of patients have been diagnosed with osteoporosis a fairly short time after... Suppose the patient said, okay, I understand, you know, full disclosure. Right. Full complete disclosure. Mm-hmm. I want Lupron. That would be okay. Yes. You're not asking to enjoin completely. No, but they need to be fully informed. And in this case, Mr. Keisman wasn't informed at all, but I don't think that just... So you're asking for, so the injunction would be an injunction to fully inform... Exactly. Anybody who might want to take... Right, because frankly there's an anti-androgen comparison form that the plaintiffs claim Mr. Keisman received, which he didn't receive. And it lists bone density loss among eight possible side effects of Lupron. And I think that that form, without more, especially couched in the way that this treatment was presented to Mr. Keisman as a way he could gain favor with the court and possible release, and if they don't discuss bone density loss at all and it's just listed on a comparison form, that is an informed consent. How much do they have to tell a patient about Lupron? I think they need to tell them what osteoporosis is and what the risks are. I mean, if you get a hip fracture, which is, which Mr. Keisman with osteoporosis is at a much higher risk of now, you have a one in five chance of dying within the first six months. And so, and so just knowing that that that's, that it's a very serious side effect is very important. Is he seeking any damages here? He is seeking damages. So he's seeking both damages and a hip fracture. Why don't you, just for the enlightenment of the other folks here, why don't you tell us why he was receiving Lupron and, and where he was kept at the time? He's kept, and he's... I can see people in the audience, they don't have the slightest idea what we're talking about. He was put on Lupron as an anti-androgen treatment to help suppress his, his sexual urges in hopes that he could reintegrate into society. Anti-androgen treatment has been used for the last 40 years, but Depo-Provera is the drug that's being used, and Lupron hasn't been used extensively for this purpose. And so, in some effects, they were conducting research on these patients without really knowing the effects. The plaintiffs claimed that they didn't know that rapid bone density loss or bone density loss could be a potential side effect, but the physician's desk reference that they themselves consulted says that if Lupron is used in chemical castration, there's a good chance that bone density loss will result. A chemical castration? Alright. And now, if he, if his bone density is, is a problem, aren't there other drugs he can take to correct that situation? There's one drug, Fosamax, that can, that can correct it. Fosamax. I see that advertised on television. The Flying Nun uses Fosamax. Well, the, the scary thing about Fosamax, and, and this is actually another contradiction in the uncontroverted facts, is at one point they say it can be used indefinitely, but really it's only been approved for two years, and it causes a serious form of cancer in rats, and no extensive long-term studies on Fosamax have been done either. So while Fosamax can compensate for some of that bone density loss, it's certainly not a viable solution until more information is available. Well, you can drink a lot of milk and do exercise and all that. It's certainly possible, but, but this is a choice that Mr. Keisman should have been presented with, and, and the amount of osteoporosis that he has probably wouldn't have been taken away by just milk and vitamin supplements, because it was rapid and it was... No, you take milk and vitamin supplements to boost your, your bone density. Okay. And you do exercise. If you, if you exercise, you, you sort of walk and you sort of pound the, the large bones, the femur, you know, and your legs, that produces more calcium and helps you with your bone density. My daughter's a doctor, so I inherited all that knowledge. Well, I want to finish up, so Ms. Larson has her time, but I want to note quickly that... Her brother's a very famous doctor. No. You've got a J.D. That's what I'm getting to. Finally, I would just like to note that the defendants are not entitled to qualified immunity. As the magistrate judge noted in an earlier order, the present case is simply not a situation... Excuse me, the what case? The magistrate judge's order in 2005, partially dismissing. You said something, a case, and I missed the word. I'm not sure what I said. I'm sorry. In this case, it's this case, the magistrate judge's motion to dismiss from 2005, he says that this case is not a case susceptible to reasonable but mistaken views as to what the law allowed. And so the defendants are not entitled to qualified immunity. And I'll turn the rest of my time over to Ms. Larson. Okay, thank you very much. Good morning. The district court erred by dismissing Mr. Christman's claims against the defendants in their official capacity because they weren't persons under 1983. The Young exception doesn't require that prospective injunctive relief be likely to be granted. It merely looks at whether there's an ongoing violation of federal law and whether there's been a request for prospective injunctive relief. And as recognized by Verizon versus Maryland Public Service Commission, no analysis on the merits was appropriate. The complaint satisfied Young by requesting the Ash androgyny program be modified. The district court erred because it dismisses not for lack of standing, but rather on a subject matter jurisdiction issue. So as I understand it, he's no longer taking. No, he's not. Right? Isn't his claim for injunctive relief moved? No, because first off, Lyons, the case that they cite, states that there's no standing on a past injury alone. However, there are several exceptions that were recognized by this court in the Duke. First, that it's an official policy. The anti-androgyny program is an official policy of Ash. And second, he does have standing because there still is a likelihood he could be placed on Lupron treatment in the future. Lupron treatment is one of only two medications that if he's released, he'll be able to use. But I thought that, at least as I understood the briefs, that nobody has to take it. They're not forcing on anybody. They can take it voluntarily, though. The uncontroverted facts say that 10 people still remain on Lupron treatment at the facility. And this case wasn't dismissed on lack of standing. It was dismissed because they weren't persons there. Well, standing is kind of a jurisdiction issue. Yeah, but it is still separate from the Ex parte Young exception. So it was essentially a decision on the merits, and that was an error. And if there aren't any questions on the Ex parte Young, I'll move to the Eighth Amendment. The following uncontroverted facts could be construed to be a material dispute to demonstrate deliberate indifference. Have you read Heydrich v. Hunter, Judge Pregerson's decision holding that the Eighth Amendment doesn't apply to civilly committed persons? Yes, but I think in a footnote from the U.S. Supreme Court in Ingram, stated that it was possible that it would. But you've got—did you bring Heydrich v. Hunter to our attention? I think we did in the due process claims. I'm not sure. It was decided on August 30, 2007. It's a case that deals very much with the kind of subject matter we have here today, and I didn't see it anywhere. You know, people detained for the purpose of treatment are not covered by the Eighth Amendment. It's basically what I understand Heydrich to stand for. Judge Pregerson probably knows better than I do, although I was also on the panel. I was surprised to see this Eighth Amendment issue come through with no mention of Heydrich from either side. Well, Judge Trott's correct. How do you get around Heydrich? My understanding is that you were required to provide adequate treatment, and I would suggest that when the treatment provided demonstrates deliberate indifference— You're not dealing with punishment anymore. That's one of the key differentiations between civilly committed people and people in prison being punished. You're dealing with cruel and unusual punishment. So the Eighth Amendment, as far as I can tell, just doesn't cover the situation at all, unless you can convince me that I've missed something. Here's what we said, basically, in Heydrich. I'll point out, as Judge Trott mentioned, that Heydrich was decided after the briefs were submitted, and that Heydrich prevents Crisman from bringing an Eighth Amendment claim because he's not a prisoner. The Eighth Amendment applies to prisoners. He's civilly committed, but it does permit him to raise a claim under the Fourteenth Amendment. The practice pointer is, before you come to the Ninth Circuit, make sure you check the latest developments after the briefs were written, because you might get clobbered by an opinion written by the person sitting in the middle of your panel. It is an excellent lesson I don't think I'll ever forget. But it's one the Attorney General's Office will never remember. Well, but the Fourteenth Amendment does, or the Fourteenth. That makes you feel a little better. Yeah. My understanding is that the Fourteenth Amendment in a pre-detainee does apply the Eighth Amendment in deliberate indifference claims in that context. So in this context of a civilly committed person, it would be reasonable to apply the same standards. Just because, I mean, deliberate indifference to someone's health is The Fourteenth Amendment brings the Eighth Amendment into play? The analysis under the Fourteenth Amendment, they did an analysis under the Fourteenth Amendment as to whether or not due process But did they get into deliberate indifference in those things under the Fourteenth Amendment? They did apply the Eighth Amendment standard in that setting. In which case? Let me find it. Is that Benson still? I don't think so. No, it was Lawley v. County of Orange. And there he was a pre-trial detainee and they did an analysis using the Eighth Amendment to understand whether or not this was a violation of the Fourteenth Amendment. So they did apply the deliberate indifference standard there. Well, anyway, in the event you go back to the district court, you can always amend the Eighth Amendment. Do you want to save a little time? Yeah. Could we reserve the following, the last two minutes for rebuttal? Let's do it. Thank you. Thank you. The Lawley case is the one you're talking about, 351 Fed 3rd? Yes. Thank you. So how was it that the Attorney General's office missed that famous case of Heidrich v. Hunter? Famous indeed, Your Honor. It actually was not missed. It actually came from our section in the office. I do say, however, I apologize that we did not point it out to the court afterwards. Just in the busyness of preparing for argument, I forgot to do that. However, our brief was submitted March of 2007 and the case came out August. And so I knew this was a time to reply, and I just failed to indicate it in writing, and I'm sorry for that. You're supposed to send us some information, a letter, calling recent authority to our attention and send a copy to the other side. Yes, Your Honor, and I apologize for not doing that. But I did know that that case applied, and I expected to see it in the reply brief, actually, and didn't. It just slipped my mind. I'm sorry about that. For a number of reasons. I'm just curious. Is any sexually violent predator who's been civilly committed to a Toscadero? That's the only place that California commits these folks. Has any of them who've been put on Luperon or any other drug, or a drug like Luperon, chemical castration that's been referred to, has anyone who's taken that drug ever been released from confinement in the hospital? Your Honor. Otherwise, is it working? I'm just curious about that. Well, let me just go back to your first portion of your question. Actually, there's a new facility called Coalinga State Hospital. Where? Coalinga State Hospital. Oh, Coalinga? And all except for a small portion of or set of the sexually violent predators are now at Coalinga State Hospital. That's up north. That's correct, Your Honor. Of the patients that are remaining at a Toscadero, I'm not sure if any of them since the move to Coalinga have been. Well, let's forget about that. Yes, yes. But Coalinga, or any of the patients that have been put on this drug, have any of them ever been released into society? Your Honor, there have been, my understanding, there have been two patients probably in the last maybe three or four years, and I believe that this was part of their treatment, but that was not part of the record in the district court, so I'm not sure. That's just going on my memory in this arena. All right. In terms of the district court, I believe that the important thing here is that we stick to the record, and the record is really clear that Mr. Chrisman and the other patients, before they started Lupron or Deprivera, because some patients took Deprivera, they were, in fact, if you look at excerpt of record 193, they were given the anti-androgen comparison. Every patient was given that comparison. It lists the side effects of both of those drugs. We have to keep it ---- He disputes that he ever received that one. Excuse me, Your Honor? Isn't that the one he disputes that he says he never received it? Your Honor, that's correct. But if we look at the uncontroverted facts and the other evidence ---- But these facts aren't uncontroverted here. Well, Your Honor, they are uncontroverted. It was pro se at the time. That's correct, Your Honor. And you look at the pleadings very generously. Correct, Your Honor. You file the complaint that was verified, and it's proper to consider a complaint when ruling on a summary judgment. Your Honor? In fact, in prisoner litigation, pro se prisoner litigation, the district court has an obligation to tell the pro se prisoner defendant the consequences of summary judgment and what the defendant must do in order to resist summary judgment. Your Honor, to ---- And I don't see any real significant difference between somebody who's incarcerated in prison and somebody who's in one of these hospitals, whether it's Kalinga or a Tescadero State Hospital. It's the same thing. I will agree and concede that it's the same thing. The problem with this case is if we go back to the record, one, the complaint was not verified by Mr. Christman. It was verified by another patient. Secondly, the declaration ---- That patient, a plaintiff in the case? This was not a class action, Your Honor. No, but was it? He did have his own case that he filed. That's correct. And he verified the complaint on behalf of all of the patients. In addition to that, the declaration, if you go back to the declaration, in the record that was verified by Mr. Christman, says absolutely no specific facts related to this case. What it says is, and if you look at the portions of the declaration specifically that he deals with, he says things like, you know, I'm looking at excerpt from record 68. After extensive investigation of this medication. That's not competent evidence that that's controverting what the doctors are saying. It is understanding that Lupron is administered approximately six months. That came from an insert of a PDR that deals with intramethiosis and deals with uterine fibroids. It has nothing to do with sexual offenders taking Lupron. Basically, you have this individual plaintiff who pulls information out of a medical book and says, this is competent evidence, and because it's in my complaint, you have to use it. A fair reading of his pleadings, though, is that the documents here is that he didn't get notice. He was not informed of the side effects of Lupron. Your Honor. Until later. Your Honor, a fair reading of his pleadings, if you look at the record, it will tell you he received notice. A fair reading of his pleadings and back to the record says he was interviewed in excerpt from record 234. You're supposed to draw inferences in favor of the non-moving party. So if there is a dispute there or if it's unclear, you would draw the inference in his favor. That's basic summary judgment procedure. But that's only if it's more than a scintilla of evidence, Your Honor, and in this case, what the ‑‑ Well, you draw the inference in his favor and then you ask, if you draw that inference in his favor, does it create a dispute and is that sufficient? Is it more than a scintilla? And it probably is. So in this case, the fact that the record actually showed, one, that he indicated he did not have notice of this, and yet we have after section after section in the record that shows that, in fact, he had additional teaching on Lupron in the record on page 234. He had more teaching on Lupron and the side effects. What does it say? What does that say? I mean, what ‑‑ that just sounds like a general statement. Well, Your Honor, because that came from his actual ‑‑ the records in his medical chart of the treatment that he was actually receiving. So in his chart, it shows every time he received information on the side effects of Lupron. And in his chart, it actually shows that he signed the consent form on at least four occasions, that he was given information at least ten occasions on Lupron, in addition to the fact that, if you go back to the record, the excerpt on 235, he was actually given information on Fosamax two years, two years before this other patient came up with outright osteoporosis. Do you know specifically what information was given to him? Do we know specifically what information? Yes. Yes, we know. We know. We know that the physicians say, one, every patient, if you look at excerpt for record, if you look at excerpt for record page ‑‑ hold on one second, Your Honor. 193, and then again on 226, and that's number 30. Every patient was given a comparison, and on this comparison, bone density loss is listed as one of six. With that bone density loss comparison sheet that they were given, every patient was told at the outset, this is to reduce your sexual urges. In order to do that, your testosterone has to be reduced. In reducing your testosterone, therefore, you may have these side effects. The number one advantages of taking Lupron versus Depo-Provera was the biggest side effect was hot flashes. The doctors always knew that bone loss was a possible side effect. The problem was ‑‑ What did he say about the information that he got? Well, he says I got no information, but that doesn't square with the record that the district court reviewed. He doesn't say he didn't get any information. He said he didn't get any. Bone density loss, the side effect. Well, he said he received information, but bone density loss was not one of those, is what he's saying. That's correct, but you just said he didn't get any information. I'm sorry, Your Honor, I meant any information about bone loss. His whole point is that it was never explained to him that taking Lupron would have the bone density consequences. I understand that he says that, but the record ‑‑ That's what the whole case is all about. That's correct that he has made that statement, but that statement by itself, when there's overwhelming evidence that says that he actually did. The problem with that is that's like, who should we believe? I believe all this weighty evidence over here and not this evidence over here. If you get to trial, you may well win. Your Honor, but that's not correct in the sense that a trial judge has to look at if there's credible evidence before him. This is not competent evidence that's before the district court in this case. So they take every ‑‑ It doesn't satisfy the rules of evidence? Well, it's not only that it doesn't satisfy the rules of evidence. Did you object on the ground to the district court? Well, of course, that would be a objection among many. But did you object in this case to the district court on that ground? Did I object to this declaration? Did you say these documents in this record, judge, you can't consider because they're inadmissible under rule of evidence 7 or whatever? Your Honor, we never got to that particular issue because Mr. Crisman refused to respond to the court's order per the local rules to respond and to file his motion for summary judgment with genuine a statement of fact. He refused, and that's really important because he ‑‑ You're saying I refused to refuse? Did he not respond? Well, we have a motion for summary judgment that was filed by Mr. Crisman that indicates he knew the rules. We do have that. Where did he refuse? I mean, that sort of implies that he said, I'm not going to do it. Well, Your Honor, he refused because, well, I actually was a part of the case and know what happened in chambers, but the bottom line is Mr. Crisman and the other plaintiffs decided how they wanted to run this case. This was all of you? All of you were in chambers? Yes. Well, Your Honor, no, they were by telephonic. They were by calls. And you're telling us the district court told them what to do and they said we're not doing it? No, Your Honor. The district court ordered all motions along with any supporting evidence to be filed by a state court. They refused to do that. You mean they didn't do it? I'm sorry, they did not do that. They didn't say on the telephone, we're not going to do that? No, Your Honor. They actually filed motions. They each filed motions for summary judgment and they filed oppositions to my motion for summary judgment. And they chose not to file an issue stating the genuine facts. Well, you know what Jones v. Blanus says, I'm sure, and let me just read this in some language. Where the plaintiff is pro se, the court must, that's a zero standard, must consider as evidence in his opposition to summary judgment all of plaintiff's contentions offered in motions and pleading, where such contentions are based on personal knowledge and set forth facts which would be admissible in evidence, and where plaintiff attested under penalty of perjury that the contents of the motions or pleadings are true and correct. You're familiar with Jones' case? I'm absolutely familiar. And here you're saying that the evidence wouldn't be admissible and the attestation was defective? I believe on those two, in addition to the fact that the declaration that's a part of the complaint, the complaint itself is not verified. The declaration that's one of the many that's attached to the complaint, it has nothing that has any evidentiary value. It is not based on the Jones v. Blanus because it does not attest under penalty of perjury to anything that directly negates anything that was filed by the uncontroverted facts. Okay, I was just trying to fit your argument into the context of Jones v. Blanus. How does Rand v. Rowland and the district court's responsibility to explain what's going to happen apply to this case? Well, Your Honor, Rand v. Rowland deals with the fair notice issue, and the fair notice issue is a specific issue that there's an exception to. And that exception, based on Rand v. Rowland, is if there's actually evidence in the record that the pro pers knew of the fact that the fair notice, whether it's in this particular case, it was the local rule, and that the pro per actually could have filed and chose not to in this case, then there's an exception. And in this case, we know that he knew there was a motion for summary judgment requirement. Did the district court tell, did the district court in this status conference, apparently, under Rule 16, in chambers, you were there and the plaintiffs were on the phone, did he tell, he said, okay, you've got to file your motions for summary judgment. Or whatever, by such and such a date. Did he also tell them, and under the local rules, you must file a separate statement of undisputed facts and back it up? Your Honor. And if so, was that conference recorded, and is there a transcript? Every conference was recorded. I'm not sure exactly what words. But what I do know, Your Honor, if I could just finish this point, what I do know is it was the appellant who filed their motions of summary judgment first. Hold on. If you go to the federal rules of civil procedure, and you look under summary judgment, Rule 56, you won't see anything that says separate statement of uncontroverted facts and the whole procedure for doing that. It's a local rule that the local court, not all district courts even have a local rule. Like the central district has. Not everybody understands or even knows about that requirement. So my question is, did the district court tell on that conference call that he say you must also file a separate statement of undisputed facts? And respond further, you know, because what the rule goes on to provide for is that you respond to the other side's separate statement, and you point out where you object and the basis for your objection. And, you know, you give the district court specific reference. And all that is intended to do, by the way, is just to make the district court's job a little easier. Your Honor. There's nothing in the federal rule of civil procedure that requires a separate statement. Two points. I believe it's important that we understand the message that was... I don't know the language, but I do remember the fact that I filed a motion to request that our uncontroverted facts actually be used because they failed to respond. So I know that there had to be a colloquy about that issue. But exactly what Judge Real's words were, I can't tell you. But I also know that it is the plaintiffs who filed their motion for summary judgment in this court. They knew the rules. They put what they thought were genuine issues in their motion for summary judgment. Is there a set of local rules at the institution where these folks were kept? I believe that there is, Your Honor. I did litigation at the Tascadero many years ago related to them having all of the different research materials there, and I believe that there is. And they're current, huh? Yes, they would be. Well, I don't know if they're current to today, Your Honor, but I do know that at the time we did the litigation, that was the purpose of that litigation. I'll tell you, lawyers who practiced in the district court, many of them could never really understand how to do a separate statement of uncontroverted facts. And the first way I used to get rid of motions for summary judgment was check to see if they had them. And then I would just take them off calendar and say, you didn't comply with the motion. You didn't comply with the local rules, because you didn't do the separate statement that's required by the local rules. And I'd make the lawyers do it all over again, and I did that because I wanted them to learn how to do it. Now, in this case, you're dealing with pro ses who were not, it doesn't look to me in the record here, that they were properly instructed, given the notice requirements and the consequences of their need to comply with the local rules, or to respond to any motion for summary judgment. Well, does it matter at all that they initiated the motion for summary judgment process? They understood the process from the beginning. They knew that. Our case law is just replete with cases. And district court judges know this very well, that when you're dealing with pro ses, you give them an extra mile, basically. Your Honor, they asked for extra time, and I didn't object to it. And you say, you know, we've got a local rule on that. Well, I didn't know that. Well, we're going to send you a copy of it. So you've got to bend over backwards. Did I hear you say you asked them to file a genuine statement of controversial facts? I'm sorry. Did I hear you say that at some point in the process you asked them for what they never came forward with? No, Your Honor. What I said was I actually filed a motion requesting the court to accept our uncontroverted facts because they failed to file theirs. So I know that there was a colloquy about that. They failed to file a genuine statement. They failed to controvert within their opposition to our motion for summary judgment. They failed to respond to any of our uncontroverted issues. So the district court then took your statement, said, uh-huh, take this statement, they lose. Judgment for the state. Well, no, I think the district court actually looked at the record. And he looked at the record and he saw that in the record included in the declaration, if you take the declaration of Mr. Christman. How do you know the district judge looked at the record? Well, Your Honor, I think the case law says we have to assume they looked at the record. You know, I spent $20 once when I was flush and bought Giuliani's book. And the only thing I remember about the book was he said, don't assume anything. Cost me $20 to hear him say that. And I'm giving you that information free. Can't assume anything. In conclusion, because I see my time is over, every issue that has been brought up by the appellant, if we go back to the record, we will see that this decision should be affirmed. Nowhere in the reference anywhere in the record does the appellant ever say, I was forced to take this, I didn't want to take this. We even have a reference in the record where he says, he knew that this was causing him bone loss, but it stopped his fantasies, it stopped his sexual urges. And so back on May 24, 2002, he said, yes, I want to continue on Lupron, even though I have bone loss. He knew that, but these doctors, the purpose was to help them get back into the community and to stop their urges. And this is exactly what was happening. The district court used the proper standard, giving appropriate... He said, I know I got bone loss? Your Honor, if you look at the record, and we'll go specifically to excerpt from record 235, number 87, he had actually, back on September 14, 2001, some 13 months before, been told that he had moderate osteoporosis. That was on one of the bone density scans that he took. Where does it say, you just said, he said, I know I got bone loss, but I want to keep going. Let's go to 235. Number, I'm on excerpt from record 235, number 87. On May 24, 2002, Mr. Chrisman renewed his consultation for antiandrogen therapy, even after he clearly was aware that he had bone loss. On the medication consultation form, the doctor quoted Mr. Chrisman as stating, it reduces my sexual urges and thinking, sexual thing, quote, side effects are very bad osteoporosis. My bones are weak, I'm in the smoking cessation program, no depression. The doctor indicated that Mr. Chrisman was calm and articulate. Mr. Chrisman wanted to continue antiandrogen therapy. Mr. Chrisman perceived the benefit from antiandrogen therapy. He denies other side effects other than osteoporosis. Your Honor, even after May 24, 2002, he actually, at that point, renewed his consultation for it. He was taken off on December 6, 2002, on the record on page 236, number 88, not because he chose to be taken off. The doctors decided to take him off of the medication. He had another bone scan, and in the end, his bone scan showed that his bones were getting better because of the Fosamax he was on. It was not getting worse. And so these doctors provided proper medical care. The record shows that he knew what he was going to do. It was a voluntary act. It also shows that there was no material issue of genuine fact. And the trial court had the record to support his decision. And this decision should be covered by the Qualified Immunity Clause in this case. Thank you very much. Let me plow some ground again, because I want to make sure I understand precisely what your argument is. Back to Jones v. Blanis. Was his complaint verified? His complaint was verified by another patient, Your Honor. It was not verified by him. If we go to the complaint, which is... You say, yeah, that's why I was confused. In your brief, you say, here, plaintiff had sufficient opportunity to inform the court that he intended to rely on his verified complaint. Your Honor, I'm sorry, I misspoke. I meant the declaration. It was the declaration, and he did not... So it's the declaration that's not verified. No, the declaration is verified. The complaint is not. The reason I hung up there is because your brief calls it his verified complaint. Your Honor, the complaint has the declaration as one of the things attached to it, but the complaint is not verified by... Yeah, but you called it verified complaint. I know, Your Honor. Let me just clarify Judge Trott's point. In my document that I have from the excerpts of record, the complaint that was filed on December 11, 2003... What number is that, Your Honor? I don't know which page it is, but I'm just talking about the complaint. Civil rights complaint filed in the district court on December 11, 2003. On page 31 of that document, following his request for relief, there's a verification by John Allen Rainwater. Rainwater is one of the plaintiffs in the complaint. That's correct, Your Honor. I said he was a plaintiff. He had his own cases. Well, they all had their own cases. This was not a class action. They're all on the caption. That's correct, Your Honor. What you're saying is that each one had to produce a verification? Is that what you're saying? I'm understanding that if this was his complaint, he would have signed it. He signed the declaration. Mr. Rainwater says... So this isn't his complaint at all? I believe that the judge assumed that this was a complaint that he could use, but it wasn't verified. And so the judge took the declaration... It was verified by Rainwater. That's correct, Your Honor. Your Honor, I meant the verified declaration. I'm sorry. And that declaration is what we referred to on page 68 of the excerpt of records. And that declaration is the declaration that is based totally on Mr. Chrisman attesting to an excerpt from the PDR where he has no professional background and no foundation for that, and he has absolutely no evidence whatsoever that any of the things in that PDR are true. Or even related to this case whatsoever, because it refers to the endometriosis and the uterine fibroids and not to the use of sexual... So if there's a complaint that names three plaintiffs, each plaintiff needs to verify the complaint. That's what you're saying? Your Honor, I've seen what the case law says. I believe for it to be a verified complaint, that's correct. Verified by that plaintiff, that's correct. So if you've got A, B, and C, and A verifies the complaint, that you don't consider that document a verified complaint, vis-a-vis B? Not if it's based on personal knowledge of... You can say yes or no. Correct, Your Honor. And I believe that Schroeder v. McDonald... At the time the district court entered summary judgment, there were three plaintiffs in the case. And who was in the case at the time for the summary judgment ruling? I believe it was Mr. Hoffman, Mr. Rainwater, and Mr. Christman. So Rainwater was still in the case at that time? That's correct. And they actually filed, all three of them filed separate motions for summary judgment individually. And then they also filed an opposition as well. Which they all signed. That's correct, yes, on the opposition. And that, in fact, would have made it a verified, if they had all signed under personal knowledge, because it related to their personal cases. That's what they alleged in the complaint. Okay. I think I understand your position now. All right, you owe us nine minutes and 58 seconds. Next time the Attorney General from California is here, we'll just deduct that. Well, it looks like I have a winning proposition, since I got $20 in information from you, too, Your Honor. You've done a good job in weathering our friendly questions. Your Honors, I'd just like to start by addressing the contention that Mr. Christman knew of the osteoporosis side effect on May 24th of 2002. May 24th of 2002 was nearly four years after he began treatment. So it does not go to informed consent throughout the course of treatment, only at that point. In addition, the fact that he knew that osteoporosis at that point was a problem still doesn't say to what extent he knew what osteoporosis was. And the fact that he wanted to continue with treatment indicates that maybe, if he wanted to continue with treatment, which he denies, but indicates that he didn't know the extent of the damage that osteoporosis caused. Second, I wanted to address the verified complaint. Mr. Rainwater, as Your Honors pointed out, was a plaintiff at the time of the summary judgment motion, and he verified the complaint. In addition, Mr. Christman signed his declaration, and in that declaration, he said that he was informed only of hot flashes and weight gain. In addition, Exhibit H to the complaint is labeled the only document given to plaintiffs regarding the side effects of Lupron, which contradicts the contention that they were given the anti-androgen comparison worksheet. You gave us a Lolly site for the proposition that the 14th Amendment somehow incorporates 8th Amendment jurisprudence. I looked in the blue brief for Lolly, and it says it's on page 33. It's not on page 33. I looked through it, and I finally found it on another page, but it's for a completely different proposition. Do you know what the Lolly case stands for? If I remember right, the Lolly case is a detainee who gets a very similar treatment under the 14th Amendment as he would have received under the 8th Amendment. And there's actually another case, Sharp v. Weston, I believe, that says that a substantial departure from exercise of professional judgment can be a 14th Amendment violation, and that's certainly similar to the deliberate indifference standard that the 8th Amendment gives. Somebody must have done something to your brief, because it's not where it's supposed to be in your table of authorities. Okay, we'll find it. Finally, I'd like to just mention that Mr. Kreisman was unable to produce a statement of genuine issues. Due to problems with access to his belongings and typewriter, they were in flux moving in and out of his office. They brought this to the attention of the district court. So he knew he had to file one? He did. He requested an extension, and it wasn't granted. How much time did he ask for? They gave him three days after his request. I'm not sure how much time he had prior to that. And three days had expired because he didn't have access, which I think is exactly what ran the rule and why the district court is supposed to tolerate infirmities and give fair notice. Now I hear you conceding that he knew he had to file one, and he attempted to, but the court ruled he couldn't because he was out of time and had no reason. At that point, he couldn't file one. He never filed one. After conceding he knew he had to file one? Yes. What did you say? His typewriter was someplace else? He was unable to look at the typewriter. He was unable to access legal materials. And I'm not entirely sure what the basis was, but it could have been moving facilities. I know they were moving around within the facility, and he had some temporary lack of access to his belongings as well, which made it very difficult for him to make a statement of genuine issues because he didn't have the paperwork that he needed to create that statement. How did he know he had to file one? He was informed by the district court. When was he informed by the district court? I'm not sure. Do you know how he was informed by the district court? It's not in the docket? It may be in the docket list. It's not in the record. And so was he informed of that after the motion for summary judgment was filed? I believe so. And he was told you need to file a separate statement of genuine issues? Yes, I believe so. And he wasn't able to do it, so he then asked for a continuance. Exactly. And the district court gave him how much time? Three days. And he was not able to meet them. I didn't see that as part of your appeal, that there was an error in denying his continuance. We did not appeal on that. You're getting in real trouble real fast here. The whole case has been the district court didn't do this and didn't do that, and now you're conceding the district court did. And then he filed for a continuance, it was turned down, and you didn't appeal it. I'm not blaming you. Regardless of the statement of genuine issues. So let's say he knew he was supposed to file a statement of genuine issues, and he didn't. And let's say there was no extenuating circumstances, so that appeal wasn't available. The district court was still obligated to consider all verified contentions, because he's a civilly committed patient. And so they were still required to consider that complaint. Which says that the only side effects he was informed about were hot flashes and waking. The case says that. That's Jones v. Blanus, the verified contentions. Jones doesn't include a factor that he knew he had to file when he didn't. Who filed the summary judgment motion in Jones? I'm not sure. I believe it would be the not the civilly committed patient. Yeah, right. A bit different. Are there any further questions? Well, that's all the district judge. Who was that gave him three days? The district court judge. When he asked for an extension because he couldn't access his stuff, he had three days. Well, who conducted the hearing? I imagine it was the district court judge. I'm not sure if it was the magistrate judge or the district court judge. Didn't he file a long report and all that? Wasn't a hearing conducted before the magistrate judge? There was a previous hearing before the magistrate judge because the magistrate judge is the one that issued the motion, the partial motion to dismiss the partial grant and partial denial of the motion to dismiss earlier. So a magistrate judge was certainly involved. That was Magistrate Judge Larson. Well, I have to take a harder look at the record. I'm not so sure that they were actually told. They knew they had to file an opposition to the motion for summary judgment. And they apparently asked for an extension of time to file the opposition. And apparently it was granted. And when they filed their opposition, they did not include a separate statement of undisputed issues. So I'm going to have to take another hard look at exactly the record. Maybe I misunderstood the record, but it was my understanding of the record. It's not entirely clear to me, at least from my notes, that they were informed. And counsel didn't seem to think that she couldn't recall in her own mind that they had been informed of the need to file a separate statement. He did know that he had to file an opposition. And he did ask for an extension of time. And as part of his request for an extension of time, he laid out that or he explained about that there were some problems with moving to a new housing unit, sudden they didn't have adequate typewriters and whatnot. And he asked for some time. It was granted. He filed his opposition, but he did not include a separate statement in that opposition. So it's not clear to me that he actually was notified. But I'm going to check the record very carefully. Thank you, Your Honors. Any further questions? Yeah, well, this case has been going on for a while, and sometimes these records aren't so easy to decipher. Okay, well, listen, thanks very much for your help. And thank the Attorney General's office. And I wish you well, and have a good trip home to Utah. And to Sacramento. And maybe you pass through security at the airport quietly. Okay.
judges: Pregerson, Trott, Paez